22 F.Supp.2d 1035 (1998)
Marilyn MONIER, Plaintiff,
v.
Kenneth S. APFEL,[1] Defendant.
No. 4:97CV1281 (MLM).
United States District Court, E.D. Missouri, Eastern Division.
September 23, 1998.
*1036 *1037 *1038 Franklin A. Williams, Brown and Crouppen, St. Louis, MO, Frank T. Koch, Harlan and Harlan, Columbia, MO, for Plaintiff.
Henry J. Fredericks, Asst. U.S. Atty., Office of U.S. Atty., St. Louis, MO, for Defendant.

*1039 MEMORANDUM AND ORDER

MEDLER, United States Magistrate Judge.
This is an action under Title 42 U.S.C. ง 405(g) for judicial review of defendant Kenneth Apfel's ("Defendant") final decision denying Plaintiff Marilyn Monier's ("Plaintiff") applications for Social Security benefits under Title II and Title XVI of the Social Security Act. Both parties have moved for summary judgment [21, 25] and the parties have consented to the jurisdiction of the undersigned United States Magistrate Judge for appropriate disposition pursuant to 28 U.S.C. ง 636(c). [12]

I.

PROCEDURAL HISTORY
On September 25, 1992, Plaintiff filed an application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. ง 401, et seq. (Tr. 120-123), and an application for supplemental security income benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. ง 1381, et seq. (Tr. 84-96), alleging a disability beginning March 2, 1990, due to carpal tunnel in both wrists and hands, disc problems with her back, arthritis in the wrist and hands and vein damage in her arms and legs. (Tr. 120, 138). The applications were denied initially (Tr. 79-83, 114-118) and upon reconsideration. (Tr. 75-78, 98-102).
Plaintiff requested a hearing (Tr. 97) which was held on September 8, 1993, before Administrative Law Judge ("ALJ") H. Lloyd Kelley. (Tr. 26-74). The ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. (Tr. 10-20). The Appeals Council denied review of the ALJ's determination (Tr. 3-5), and the decision of the ALJ stood as the final determination of the Commissioner.
Plaintiff then brought a civil action before the United States District Court for the Western District of Missouri, Central Division. In an order dated May 7, 1996, the District Court reversed the Commissioner's decision and remanded the case to the Commissioner for further proceedings. (Tr. 329-339). In an order dated July 1, 1996, the Appeals Council vacated the previous decision and remanded this case for further proceedings. (Tr. 340-341).
A second and supplemental hearing was held on December 2, 1996, before ALJ Phyllis Weber. (Tr. 289-328). Judge Weber determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 269-282). The Appeals Council again denied review of the ALJ's determination (Tr.262-263), and the decision of Judge Weber now stands as the final determination of the Commissioner.

II.

TESTIMONY BEFORE THE ALJ IN THE INITIAL HEARING
Plaintiff testified before the ALJ on September 8, 1993. She stated that she was 39 years old, graduated from high school, was divorced and had two children, ages 15ฝ and 14, neither of whom lived with her. Plaintiff reported that she was 5'2" tall and weighed approximately 170 pounds. (Tr. 29, 43, 47). She lived in Belle, Missouri. She had no income at the time of the hearing and did not receive general relief or food stamps. (Tr. 44).
Plaintiff testified that she was a registered medical assistant which required completing a special one-year course. (Tr. 29). Plaintiff's training included office procedures, medical transcription training, laboratory work using a microscope, and phlebotomy work. (Tr. 50). Plaintiff stated she completed her training in 1991 and then worked as a personal care attendant for approximately three months. Her job was very flexible and permitted her to work around her physical therapy appointments. (Tr. 29-20). Plaintiff stated that medical transcription was difficult for her because she was clumsy at it; however, she was able to pass with the minimum speed required, with fifty one words per minute. (Tr. 50-51). Plaintiff also stated that in the past fifteen years, she worked as a stitcher and top-stitcher in the shoe manufacturing business. She operated a sewing machine and primarily sat, but also did some walking and standing. (Tr. 30-31).
*1040 Plaintiff reported that she received treatment from two or three different doctors. One was Dr. James Leslie, an orthopedic surgeon, who performed Plaintiff's carpal tunnel surgery and supervised Plaintiff's post-operative course of treatment. Dr. Leslie performed the surgery on Plaintiff's left hand in 1990. Plaintiff testified that after the surgery she never regained full use of her hand and never regained all of the strength back. She said it left her approximately 33 1/3 % disabled in the left hand after the surgery and physical therapy. (Tr. 31).
Plaintiff wears a brace on her left hand. (Tr. 31). Plaintiff testified that she began wearing a brace on her left hand before her surgery. She wears it on an as-needed basis, like when she needs to drive a vehicle or lift something. (Tr. 32). Other than wearing a brace, Plaintiff reported that she also used Arthrocare cream, she takes hot showers or puts her hand in warm water and she does hand exercises. (Tr. 34). Plaintiff stated she needs to rest her hands depending on how much she uses them. If she is using them a lot, she needs to stop frequently for ten-minute breaks. (Tr. 34). No one has ever recommended to Plaintiff that she participate in a work hardening program, attend a pain management clinic or use a TENS unit. (Tr. 46).
Plaintiff stated that she was approximately fifteen percent disabled in her right hand. Dr. Leslie informed her that if it did not get any worse than that, he would rather not operate because he was not pleased with the way the left hand responded to the surgery. Plaintiff is right handed. (Tr. 32-33). Dr. Leslie told Plaintiff that she could no longer go into production work, factory work or manufacturing. (Tr. 33).
Plaintiff reported that every morning when she wakes up, she has numbness with tingling in her right hand. The left hand has a dead feeling to it with no strength. Plaintiff reported that as the day progresses, the tingling and numbness diminishes, but she always has the sensation as if her fingers are going to sleep. (Tr. 33-34).
Plaintiff stated that she often drops things; she is always scratching herself or hurting herself when she tries to grab the things she drops. When she tries to cook, she often burns herself. She is very clumsy. She has difficulty opening cans and she takes a long time to write letters. (Tr. 33).
Plaintiff testified that she has been treated by Dr. Curtis Cox, a neurosurgeon. She began seeing Dr. Cox for her low back injury. Dr. Cox had Plaintiff undergo an MRI and then treated her with physical therapy. He said he would prefer not to operate until her condition worsened. He believed that if Plaintiff walked, took care of herself and tried to get stronger, her back situation would improve. (Tr. 34-35). She said her pain worsens when she rides in a vehicle, sits on the floor and then tries to stand up, and in cold weather. She said she tries to alleviate the pain with warm showers, medication, and Arthrocare cream. She usually takes a hot shower every day but, when her back is especially painful, she takes up to three showers a day. She needs to take three showers a day about three times a week. (Tr. 36-37). She also lays on her stomach on the floor to alleviate the pain. She usually has to lay on the floor twice a day for about ten to fifteen minutes. (Tr. 36).
Plaintiff testified that she takes Ibuprofen 600 for pain, which is prescribed by Dr. Cox and Dr. Leslie. She said it does not alleviate the pain, which is a dull ache all the time. However, the medication does relieve some of the pressure build-up, especially at night. Plaintiff stated that she takes the medication three to four times a week and only takes it when the pain gets unbearable. (Tr. 37)
Plaintiff reported that she sees Dr. Joyce Reed for her high blood pressure. Her hypertension is controlled with medication. (Tr. 47).
Plaintiff goes to bed around 9:30 in the evening and rises around 6:30 in the morning. She usually wakes up on average of three times a night due to her back pain. (Tr. 37-38). Plaintiff reported that she drives her car about three times a week. (Tr. 38). She lives by herself in an apartment. However, she has a number of people around so she has help if she needs it and her living space is small so she does not have a large area to take care of. (Tr. 38). She *1041 said she does the dishes and cooks for herself. (Tr. 38). She does not dust very often. She tries to get someone else to vacuum. If she has to do the vacuuming, she usually needs to lay down afterwards. Plaintiff said she does the grocery shopping but someone needs to go with her to carry the groceries. (Tr. 29). She reads a lot, watches a lot of television, and picks things up around her apartment. (Tr. 42).
Plaintiff stated that she tries to walk every day, weather permitting. She usually walks two times a day anywhere from two to five miles, total. (Tr. 39-40). Plaintiff reported that she can stand in one area for about ten to fifteen minutes before she gets uncomfortable. Plaintiff said she can sit for ten to fifteen minutes before her back starts aching. (Tr. 40). According to Plaintiff, she can lift five pounds with her left hand and she can lift approximately ten pounds with the right hand. (Tr. 40-41).
Plaintiff testified that she did not attend church and did not belong to any clubs or organizations. Prior to her injury, she was active in Girl Scouts and in school activities. (Tr. 47). She visits her parents once every two weeks. One a week, Plaintiff visits a friend. She goes to the post office every other day. (Tr. 48).

III.

TESTIMONY BEFORE THE ALJ AT THE SUPPLEMENTAL HEARING
Plaintiff testified before Judge Weber on December 2, 1996. She stated that she was divorced and lived by herself. She had no source of income. However, she reported that she receives general relief in the amount of $80 per month and has been receiving that since her injury in 1992. In addition, she is in FHA housing which does not require her to pay rent. She pays for her food with food stamps. She receives a utility check in the amount of $48 per month which helps her with her utilities. She also receives energy assistance one time per year. (Tr. 292-293, 295). Plaintiff testified that she graduated from high school and completed one year of college where she studied medical assistance. She stated she was a registered medical assistant. (Tr. 293).
Plaintiff reported that she was employed with Brown Shoe Company from 1981 to 1990. She stopped work there due to her carpal tunnel syndrome in her left hand. She applied for and received Worker's Compensation. (Tr. 294). She received a lumpsum payment in the approximate amount of $5,000. (Tr. 295). Plaintiff testified that after she received her Worker's Compensation settlement, she tried to work as a personal care attendant but had difficulty doing so because of her back. She last worked in June 1992 and has not worked since. (Tr. 295).
Plaintiff reported that she had surgery on her left hand. (Tr. 308). The doctor told Plaintiff that the surgery was not as successful as he had hoped. (Tr. 309). Plaintiff stated that she has not had surgery on her right hand and surgery on the right hand is not anticipated. (Tr. 308). The doctor told Plaintiff that laser surgery might possibly help Plaintiff but the doctor could not guarantee it. (Tr. 308-309). She does, however, do exercises on a daily basis to strengthen her right hand in order to correct her problem. (Tr. 296).
Plaintiff stated that she is clumsy and often drops things, like frying pans, water glasses, pencils, and ink pens. She cannot carry things well, she cannot sit very long and she cannot stand for very long at one time. The doctor told Plaintiff that she drops things because of her carpal tunnel in her hands which has caused nerve damage. The nerve damage has caused her to lose feeling in her fingers. Her fingers feel numb and tingle. (Tr. 299). Plaintiff stated that she wears splints approximately three to four times a week, normally. The splints give her more strength. (Tr. 300).
Plaintiff testified that she has pain in both wrists and both hands. When she goes to sleep at night, her hands tingle, go to sleep and are numb. Her hands have no strength in them. She also has times during the day when her hands tingle or are numb. She testified that the pain level in her hands on a scale of one to ten is about a five. She said that if she holds onto something for very *1042 long, like five minutes, her hands will go to sleep and will go numb. Likewise, if she writes for very long, her hands go numb. (Tr. 303).
Plaintiff stated that she has problems with her back because she has "several discs that are messed up." (Tr. 298). She also has bulging discs. She follows Dr. Cox's advice and walks a lot and takes medication for her back. She said she tries to walk at least two and a half miles twice a day when the weather permits. She also takes warm baths, uses a heating pad and uses Arthrocare cream. She said she lays down approximately twice a day for five to ten minutes and elevates her feet. This relieves the pain in her back. (Tr. 298, 310-311). Plaintiff testified that the pain level in her back is a six, on a scale of one to ten. (Tr. 303). She described the pain as an aching, nagging pain that wears her down. She also has stiffness. (Tr. 309). Sitting definitely makes her pain worse, as well as riding in a vehicle. (Tr. 309). Plaintiff reported that Dr. Cox has not recommended surgery and believed that what Plaintiff was presently doing to take care of her back was all she needed to be doing. (Tr. 307). Other than the problems with her wrists and back, Plaintiff testified that there was nothing else that kept her from working. (Tr. 298).
Plaintiff stated that sometimes she goes to the grocery store and sometimes a friend goes for her. She is able to carry her groceries in small amounts. She said she drives her own truck but does not take long trips. She will drive approximately fifteen miles one way. (Tr. 305). Plaintiff takes care of some of her household chores. If she has a chore which is of a heavy nature, like moving furniture, she has friends help her. Her apartment is small, so she does not have trouble dusting and other such things. (Tr. 306). Plaintiff said she likes to watch television, she likes to read and she likes to walk. (Tr. 306). Plaintiff said she attends church. She has a boyfriend and they go out to eat. (Tr. 308). She is clumsy when she eats, however. She often drops her fork and has trouble cutting with a knife. (Tr. 308).
Plaintiff said she has trouble standing in one position after fifteen minutes. (Tr. 306). She can lift five pounds with the left hand and ten pounds with the right hand. She can lift approximately fifteen pounds using both hands. (Tr. 307). She has trouble sitting because she gets stiff and achy, which requires her to change her position. (Tr. 307). She can sit for about fifteen minutes before she needs to move around. As long as she can stretch or change her position, she feels relief. (Tr. 309).
Plaintiff reported that she goes to bed at night between 10:00 and 10:30. She wakes up between 4:00 and 7:00 in the morning. She wakes up approximately three times during the night because of the pain. (Tr. 312-313). Plaintiff stated that she takes Ibuprofen three times a day, usually in the morning when she wakes up, around noontime and then again before she goes to bed. (Tr. 316).
John F. McGowan, a vocational expert, also testified before the ALJ. Dr. McGowan indicated that he had looked at the record and had listened to Plaintiff's testimony. He then classified Plaintiff's past relevant work. He stated that her work as a personal attendant for four months in 1992 is generally considered to be unskilled direct entry work. If she had to lift people, then her work would be classified as heavy. The expert testified that Plaintiff's past work with Brown Shoe as a sewing machine operator, specifically a top stitch operator, is classified as semiskilled and requires a full range of reaching and handling using both arms, hands and feet to do the work. It is classified as light. (Tr. 318-319).
The ALJ then asked Dr. McGowan the following hypothetical question:
I want you to assume a woman who is 42 years of age with a similar work background and education level of the claimant, that would be 12 years plus training in, I think, medical technology through Voc Rehab and that this person has โ because of back problems and pain at a mild level, however, is limited in bending and that this individual has been diagnosed with carpal tunnel syndrome in both hands but is able to lift ten pounds with the right, five pounds with the left, presumably in combination 15 pounds, but should not do any vigorous repetitive work with the hands *1043 and would be limited to a sit/stand option. Are there any jobs for such an individual?
(Tr. 319). The expert responded that this individual could perform the jobs of information clerk, security monitor, and dispatcher. (Tr. 320-321).
The ALJ then asked the expert to assume that the individual needed to lie down approximately two times a day for brief periods. The expert testified that the individual would not necessarily be precluded from doing any of the jobs he identified; however, the problem would be whether facilities would be available where the claimant could lay down, and that is not a predictable factor. (Tr. 322).
Upon cross-examination, Plaintiff's attorney asked the expert to assume the restrictions identified by Dr. Cox in his report of July 1993. Specifically, he asked the expert to assume that the individual was limited to a total of four hours standing per day (one hour at a time) and sitting a total of three hours per day (fifteen minutes at a time). Based on this report, the expert testified that the individual would be unable to perform the three jobs he identified. He further stated that the limitation of sitting for only fifteen minutes at a time would preclude the individual's ability to engage in the jobs requiring a sit/stand option. (Tr. 324-326).

IV.

MEDICAL AND OTHER RECORDS BEFORE THE ALJ
On January 6, 1989, Plaintiff sprained her right ankle. Plaintiff was examined by Dr. Joyce Reed, Plaintiff's general physician. The doctor's assessment was a significant right ankle sprain most probably a grade III. On that same date, Plaintiff also had complaints of numbing paresthesia of the hands. There was positive Tinel's sign over the medial nerve with significant numbing paresthesia noted. Dr. Reed felt Plaintiff should be worked up for carpal tunnel syndrome. (Tr. 211-212).
On April 19, 1989, Plaintiff was seen again by Dr. Reed. Plaintiff stated that she was feeling well although she continued to have some intermittent pain in the right ankle. (Tr. 212). Plaintiff displayed positive Tinel's sign of the median nerve bilaterally. The doctor again indicated that Plaintiff should be worked up for carpal tunnel syndrome. (Tr. 212).
Plaintiff received no further medical treatment until February 15, 1990, when James Leslie, M.D., examined Plaintiff for the Division of Vocational Rehabilitation. Plaintiff complained to Dr. Leslie of pain in her neck, low back, both hands and the right ankle. Physical examination revealed that Plaintiff had full range of motion in the cervical spine. The lumbar spine showed forward flexion fully performed with the finger tips reaching the floor. There was tenderness to palpation at the base of the cervical spine and there was some prominence of the spinous processes and soft tissue in this region. Straight leg raising was negative. There was no evidence of limitation of spine movement and no evidence of muscle spasm. (Tr. 200-201).
Plaintiff's hands showed the ability to make a full fist although Plaintiff expressed some feeling of weakness of grip. There was tenderness to palpation along the flexor tendon of the long finger of the right hand but no specific tenderness in the left palm. Forearm supination and pronation was fully performed as was wrist flexion, extension, ulnar and radial deviation. Sensation testing to pinprick stimulation of the arms indicated glove type decrease in sensation from the wrist down, bilaterally. (Tr. 200-201).
Multiple x-rays were taken of the hands, neck and back. X-rays of the cervical spine did not show specific evidence of degenerative intervertebral disc change, nor of significant arthritic change. Lumbar spine x-rays did not look remarkable other than for some anterior marginal early arthritic spurring and perhaps some narrowing of the L5-S1 intervertebral area. X-rays of the hands did not show significant findings that would be considered abnormal other than possibly some very mild early arthritic changes. (Tr. 200-201).
Dr. Leslie diagnosed Plaintiff with possible early osteoarthritic changes of some of the fingers with associated flexor tendonitis. He also stated that the possibility of impending *1044 or early carpal tunnel type symptoms must be considered. He believed that, in order to rule out these possibilities, a bilateral upper extremity EMG study should be conducted. (Tr. 201). Dr. Leslie's suggested therapy was to attempt a job category change to eliminate the heavy use of the hands, right foot and right ankle in work performance. He also suggested that repetitious movements be avoided. (Tr. 201). He concluded that he saw no reason not to proceed with assessment for vocational potential and training. (Tr. 202).
On March 7, 1990, Plaintiff complained to Dr. Reed of numbness, tingling and some swelling with both hands. She said she was unable to grip with the right hand. Physical examination revealed mild edema of the right hand. Phalen's sign was positive, bilaterally. The doctor diagnosed Plaintiff with paresthesia, bilaterally, and tenosynovitis. Plaintiff was prescribed Naprosyn and was given splints for her hands. (Tr. 224).
On March 9, 1990, Plaintiff was seen by Brenda Guenther, D.O., at the Charles E. Still Osteopathic Hospital, with complaints of right hand pain. She stated that she had pain in her left arm as well. Examination revealed a slight decrease in flexion and extension of her wrists bilaterally. She had full range of her digits, however, the right digits were somewhat stiff in movement. Manual muscle testing showed strength to be essentially 5/5 throughout with the exception of the dorsiflexion. Findings were consistent with bilateral carpal tunnel with the left hand showing more evidence of carpal tunnel than the right. The doctor also believed that Plaintiff had a significant amount of tenosynovitis with some overuse type syndromes causing a significant amount of pain in her right arm and hand. (Tr. 220-223).
On March 14, 1990, Dr. Reed examined Plaintiff, who returned for a checkup still complaining of her right wrist being sore. Examination revealed a positive Phalen's sign, bilaterally, and a negative Tinel's sign, bilaterally. Dr. Reed diagnosed Plaintiff with bilateral carpal tunnel syndrome and tenosynovitis of the right hand. The doctor recommended that Plaintiff continue splinting her hands and taking medication. The doctor also discussed with Plaintiff the possible need for surgery. The doctor instructed Plaintiff to avoid repetitive activities, gripping and pulling with the hands. (Tr. 209, 224).
On March 28, 1990, Plaintiff continued to report marked pain in the right hand and paresthesia to both hands. Dr. Reed noted that Plaintiff's nerve conduction studies were consistent with bilateral carpal tunnel syndrome. She instructed Plaintiff to continue taking Naprosyn and to continue wrist splinting at all times. (Tr. 207).
On April 11, 1990, Plaintiff reported to Dr. Reed that her symptoms had improved somewhat. She still experienced some paresthesia in the left hand and considerable pain in the right hand. However, Plaintiff told the doctor that she had been more active at home and was doing household chores. The doctor noted that there was palpable tenderness along the mid aspect of the right wrist and right hand. Plaintiff also still had a positive Phalen's sign in both hands. Plaintiff was again instructed to continue taking Naprosyn and to continue with the splints and the warm soaks. (Tr. 207).
On April 25, 1990, Plaintiff complained of occasional paresthesia in the left hand. She also continued to complain of pain in the right hand, which limited her gripping and occasionally caused her to drop things. Phalen's sign was only mildly positive, bilaterally. The doctor assessed Plaintiff with bilateral carpal tunnel syndrome and tenosynovitis of the right hand, which was gradually improving. The doctor instructed Plaintiff to wear her splints only at nighttime, to continue with warm soaks and to begin exercises with the hands. (Tr. 207).
Plaintiff returned to Dr. Reed on May 9, 1990. She reported continuing intermittent paresthesia to the left hand but reported that the right hand was improved as far as pain is concerned. Phalen's was positive on the left side and negative on the right side. There was no tenderness with palpation to the right hand and thumb. The doctor assessed Plaintiff with bilateral carpal tunnel syndrome and tenosynovitis of the right thumb. Plaintiff was instructed to wear the left wrist splint on *1045 a continual basis and to continue with warm soaks. She was also instructed to splint her right wrist at bedtime. (Tr. 207).
On May 14, 1990, Dr. Reed completed a "General Medical Examination Record" for the Division of Vocational Rehabilitation. The doctor noted that Plaintiff had been unable to work since March 6, 1990 due to paresthesia and pain in both hands. The doctor reported that Plaintiff had positive Phalen's and Tinel's signs bilaterally together with tenderness along the right thumb. She diagnosed Plaintiff with bilateral carpal tunnel syndrome, tenosynovitis of the right thumb, and a history of Achilles tendon strain. She indicated that Plaintiff should avoid repetitive activities, gripping and pulling with the hands. (Tr. 208-209).
On May 23, 1990, Plaintiff still reported a problem with paresthesia to her left hand, with occasional paresthesia to her right hand. Positive Phalen's signs were noted bilaterally, worse on the left. Dr. Reed continued to diagnose Plaintiff with bilateral carpal tunnel syndrome, worse on the left, and resolving tenosynovitis of the right hand and thumb. Dr. Reed referred Plaintiff to Dr. Leslie regarding possible carpal tunnel release surgery. (Tr. 206). Carpal tunnel release was performed by Dr. Leslie on July 26, 1990. (Tr. 191, 198).
On December 6, 1990, Dr. Leslie issued a report to Vocational Rehabilitation. He reported that on July 26, 1990, a carpal tunnel release was performed on Plaintiff's left hand and thereafter Plaintiff received a regular program of rehabilitation physical therapy. The doctor believed she had progressed satisfactorily with the program. Examinations since her surgery indicated satisfactory progress with the return of strength to a satisfactory level for ordinary activity in the left hand. The doctor noted that Plaintiff persisted with some mild symptoms in the right hand but he did not feel that surgery was required at that time. Dr. Leslie reported that he last examined Plaintiff for the status of her hands on November 14, 1990, at which time Plaintiff indicated that she was doing fairly well with the use of the left hand. She did report that there was still a slight amount of soreness and occasional tingling in the right hand. The doctor believed that Plaintiff could be released from active treatment and could return to work. However, she would probably need some form of schooling to prepare her for a less physically demanding type job. The doctor did not believe that she should return to the work that she was performing at Brown Shoe Company due to the repetitious nature of that work. He believed that Plaintiff's symptoms would either return or persist if she returned to work of that nature. In summary, the doctor stated that Plaintiff was considered disabled as far as physical repetitious work activities were concerned but she should be considered capable of returning to schooling for training for some other type vocation. (Tr. 191-192).
On January 4, 1991, Plaintiff was seen again by Dr. Leslie with neck and back complaints. She apparently had been involved in a motor vehicle accident in October 1990. She indicated that she was feeling better and had started school in December. Straight leg raising was negative. X-rays showed no definite fracture. The doctor diagnosed Plaintiff with persisting lumbar sprain and instructed Plaintiff to do back exercises. (Tr. 189).
Dr. Jerome Levy examined Plaintiff on January 18, 1991. Plaintiff reported to Dr. Levy that her left hand had not improved much since the surgery. The numbness and tingling were gone, but her hand was still weak. She also said she had sharp pains in the left hand when turning it in certain directions. (Tr. 215). As for her right hand, she complained of weakness and of intermittent numbness and occasional tingling. Physical examination revealed equal strength in both extremities. However, Plaintiff was unable to squeeze the dynamometer with either hand. There was no measurable muscle atrophy or motor weakness. Sensory examination showed diminished sensation to pin prick in a stocking distribution of the entire left hand without relation to dermatome pattern. Tinel's sign was not present. There was slight discomfort on motion of both wrists. Deep tendon reflexes were equal and active bilaterally. Circulation was normal. All joints moved through a full range of *1046 motion. The doctor's diagnosis was status post left carpal tunnel release, chronic strain of the left wrist, carpal tunnel syndrome of the right wrist and chronic strain of the right wrist. In Dr. Levy's opinion, Plaintiff had a permanent partial disability which he would rate at thirty percent of the left upper extremity at the wrist and twenty percent of the right upper extremity at the wrist. He indicated that the combination of the impairments created a greater disability than the simple total of each. (Tr. 216-217).
On February 8, 1991, Plaintiff returned to see Dr. Leslie with complaints of some aching in the low back. She indicated that the exercises helped some. The doctor's diagnosis remained the same as of January 4, 1991, i.e., persisting lumbar strain, and he instructed Plaintiff to continue with the exercises. (Tr. 189).
On March 27, 1991, Plaintiff reported to Dr. Leslie that she felt better. She said she only had some aching in her back in bad weather. She was diagnosed with persistent lumbar strain and was instructed to continue with exercises. (Tr. 190).
On May 17, 1991, Dr. Reed examined Plaintiff and noted that Plaintiff suffered from increased blood pressure. Her blood pressure reading was 148/100. (Tr. 205). On May 17th, Plaintiff was also examined by Dr. Leslie to whom she continued to report that her back felt better. She reported that her hands have been sore during the bad weather. She told the doctor that she was still in business school and would finish in December. Physical examination revealed that Plaintiff had full range of motion in her back. Straight leg raising was negative bilaterally. (Tr. 190).
On June 3, 1991, Plaintiff returned to Dr. Reed for a routine examination. Her blood pressure reading was 168/100. (Tr. 205). On June 7, 1991, Plaintiff's blood pressure was 158/100. Dr. Reed noted that Plaintiff's blood pressure was still elevated and she discussed with Plaintiff the need for increased exercise and weight loss to avoid the need to take anti-hypertensive medication. On July 31, 1991, Plaintiff returned to Dr. Reed with a blood pressure reading of 142/98. (Tr. 205). Plaintiff was started on blood pressure medication. (Tr. 204-205).
On July 9, 1991, Plaintiff returned to Dr. Leslie. He noted that Plaintiff had good range of motion in the back. Straight leg raising was negative bilaterally. He continued to diagnose Plaintiff with lumbar strain. (Tr. 187).
On August 5, 1991, Plaintiff's blood pressure reading was 124/84. On August 7th, her blood pressure reading was 120/82. Dr. Reed noted at that time that Plaintiff's hypertension was much improved. Plaintiff was to continue with a regimen of anti-hypertensive medication. (Tr. 204).
Plaintiff returned to Dr. Leslie for a routine follow-up examination of her back on October 16, 1991. She indicated that she still had pain. It was not constant, however, and mostly occurred when she was riding in a truck or had been sitting for a long period of time. She said it was not unbearable but is was an ache. Straight leg raising was negative. The doctor continued to diagnose Plaintiff with lumbar sprain. (Tr. 187).
On November 19, 1991, Plaintiff's blood pressure reading was 144/96. Plaintiff had apparently stopped taking her blood pressure medication. Dr. Reed noted that Plaintiff's blood pressure was well-controlled with medication and instructed Plaintiff to begin taking her medicine again. (Tr. 204).
On December 17, 1991, Plaintiff reported to Dr. Reed that she was having wrist pain in her right wrist in the area where she had previously had problems with tendonitis. There was some mild palpable tenderness along the dorsal medial aspect of the right wrist. The doctor believed Plaintiff had tenosynovitis of the right hand and wrist. Dr. Reed instructed Plaintiff to splint the area again, to use warm soaks and to take Naprosyn. (Tr. 203-204).
On February 26, 1992, Plaintiff was seen by a neurosurgeon, Curtis Cox, M.D., at the Jefferson City Bone and Joint Clinic, Inc. (Tr. 183). Plaintiff was referred to Dr. Curtis by Dr. Leslie. Plaintiff's main complaint was pain in the low back and numbness and pain down the right lower extremity to the foot. Plaintiff underwent an MRI which was *1047 positive for a herniated disc on the right side and was negative on the left side. She had moderate paraspinal muscle spasms. She could walk on her heels and toes, with pain evident while heel walking. The doctor's impression was lumbar radiculopathy from a herniated disc at L4-5 and L5-S1 on the right. (Tr. 183). The doctor recommended an Epidural DepoMedrol Injection to be followed by a program of physical therapy. If this failed, the doctor believed that Plaintiff would be a candidate for lumbar laminotomy and diskectomy at both levels, L4-5 and L5-S1 on the right. (Tr. 183).
On March 25, 1992, Plaintiff indicated that she had improved following her epidural injection. She also stated that the therapy was helping. Plaintiff told Dr. Cox that she was doing a lot of walking at home and some exercises. The doctor believed that as long as therapy and conservative care was working, there was no need to proceed with operative intervention. (Tr. 184).
On April 29, 1992, Dr. Cox noted that Plaintiff's low back pain had improved. She stated that the traction at therapy really seemed to make a significant difference. She still had some soreness in the back and soreness down the right ankle, but otherwise she was doing fine. Plaintiff reported that she was walking about five miles a day. The doctor told her that she needed to lose weight to improve her back. He also instructed her that she needed to avoid heavy lifting and prolonged sitting. The doctor's impression was lumbar radiculopathy from herniated disc at L5-S1 with slight asymmetric bulging on the right side at L4-5 as well and disc desiccation at all three levels in the low back. She was to continue her home therapy and see the doctor again in August for a final evaluation. (Tr. 185).
On July 7, 1992, Plaintiff was seen at the Phelps County Regional Medical Center with complaints of swollen ankles. (Tr. 149). Plaintiff underwent a bilateral lower extremity venous duplex scan. The impression of William W. Cottingham, D.O., who reviewed the scan, was: (1) normal bilateral lower extremity Doppler arterial screening examination; (2) no evidence of venous thrombosis; and (3) probable venous insufficiency of the left lower extremity. Plaintiff was discharged from the emergency room in stable condition. (Tr. 149). She was instructed on discharge to decrease her use of salt and to elevate her legs. (Tr. 154).
On August 3, 1992, Plaintiff was seen again by Dr. Cox who noted that Plaintiff was doing very well. She had minimal discomfort in the low back without any radiation into the legs. She had negative straight leg raising bilaterally. She had soft paraspinal muscles and normal ankle jerks bilaterally. The doctor noted that although Plaintiff had some structural abnormalities in her low back, in light of the fact that she was doing very well and was largely asymptomatic, the doctor believed there was no need for surgical intervention. Plaintiff was discharged from Dr. Cox's care. (Tr. 186).
On November 5, 1992, Plaintiff was examined by John Demorlis, M.D., for a disability physical. Physical examination revealed no swelling of Plaintiff's joints. There was no atrophy and no deformities. Plaintiff did not have varicosities. Tinel's sign was negative. She had stocking glove decreased sensation of the left forearm to include the wrist, hand and fingers. She had upper and lower motor strength of + 5/ + 5. She could do two-thirds of a squat and could heel and toe walk. She had a normal gait. She had complete range of motion in the shoulders, elbows and wrists. Plaintiff could fully extend her hands and could make fists. She had full range of motion in her hips, ankles, cervical spine and lumbar spine. The doctor's impressions were: (1) subjective hypoparesthesia left forearm, wrist, hand and hyperparesthesia right wrist and hand (apparently due to carpal tunnel and possibly failed left carpal tunnel surgery); (2) arthralgias; (3) history of a probable lumbar disc herniation; (4) no significant venous insufficiency found; and (5) exogenous obesity. The doctor indicated that there was no evidence of incompetency or obstruction of the deep venous return. (Tr. 170-176).
On December 4, 1992, Plaintiff underwent a "Comprehensive Functional Capacity Evaluation" by Rusk Rehabilitation Center to assist the Division of Vocational Resources in vocational placement. (Tr. 155). When *1048 Plaintiff was asked to indicate how a typical 24-hour day was divided among the activities of sitting, standing/walking and sleeping/lying down, Plaintiff gave the following profile: sleeping or lying down, 9.0 hours; standing or walking, 7.5 hours; and sitting, 7.5 hours. The doctor's objective findings included the following with respect to Plaintiff's back. She had an independent gait requiring no assistive device. Speed, symmetry and rhythm were normal. There was poor correlation between Plaintiff's movement patterns and her pain rating of 7/10+. Plaintiff's sitting posture was unremarkable. Lumbar lordosis appeared normal to slightly increased. Plaintiff could heel-toe walk. Initially, Plaintiff claimed she could not squat; however, with coaxing, she was able to squat and return to standing without much difficulty. (Tr. 159). When tested for repetitive forward bending of the lumbar spine, it was noted that Plaintiff performed ten repetitions in 45 seconds. There was no over-reaction or end-stretch noted. Her range of motion remained consistent and her lumbosacral rhythm was normal. Her pain rating of 5/10+ did not correlate with the doctor's observed movement patterns. During the fast repetitive bending test, Plaintiff performed 25 repetitions in 65 seconds. Her range of motion remained consistent with repetitions and her lumbo-sacral rhythm remained smooth. She continued to rate her pain as 5/10+; however, her movement patterns did not correlate well with this pain rating. (Tr. 160).
As for Plaintiff's upper extremities, the doctor noted that there was no edema, especially in the hands. Phalen's sign was positive in the right hand after twelve seconds and in the left hand after two seconds. Range of motion in the upper extremities was within normal limits. (Tr. 161-162). She scored within normal function on the right hand in six of seven subtests, testing fine manipulatory skills. However, she had poor fine manipulatory skills of the left hand. She scored at the 14th percentile in performing assembly tasks. (Tr. 162-163).
Plaintiff attempted seven material handling tests. Although Plaintiff's results were low, the doctor noted several inconsistencies. For instance, at first Plaintiff said she could only carry an empty milk crate weighing two pounds. However, she demonstrated an ability to carry a sandbag weighing ten pounds over a distance of fifteen feet. She gave the clinical appearance of exerting a great deal of effort and on one occasion let the object fall to the floor and began dragging it to complete the task. However, on another occasion she was able to carry it the full fifteen feet. On another occasion, Plaintiff attempted to push an empty sled requiring 18 ft.-lbs of force and reported being unable to complete the task. However, this did not correlate with the doctor's observations of Plaintiff's demonstrated ability to easily push open the clinic door at the time of departure, which required 32 ft.-lbs. of force. (Tr. 164). The doctor noted that Plaintiff's results did not correlate with her demonstrated strength during the musculoskeletal examination. (Tr. 165).
In summary, the doctor noted that there appeared to be discrepancies between Plaintiff's perception of her functional abilities, her results of the musculoskeletal and hand evaluations and self reports of specific activities. The doctor believed that Plaintiff could increase her functional abilities if she continued her prescribed home exercise program on a daily basis, if she utilized work simplification and energy conservation techniques, if she wore splints on her wrists during repetitive use and if she continued with her walking program on a daily basis to promote cardiovascular fitness and weight loss. The doctor also believed that Plaintiff would benefit from instruction on proper body mechanics and lifting techniques to decrease the amount of stress to the low back. Finally, the doctor noted that Plaintiff would benefit from participation in a work tolerance program focusing on improvement of functional abilities. (Tr. 168-169).
On July 7, 1993, Dr. Leslie completed a Physical Medical Source Statement. With respect to Plaintiff's ability to lift, carry, stand, walk, sit, push and pull, Dr. Leslie deferred to the reports of Dr. Cox. He also deferred to Dr. Cox's reports with respect to climbing, balancing, stooping, kneeling, crouching and bending. Dr. Leslie found *1049 that Plaintiff was limited in her ability to reach, handle, finger and feel. He believed that she was limited because of her past history of bilateral carpal tunnel syndrome. In the doctor's opinion, resuming work of a rapid hand use could cause reactivation of Plaintiff's carpal tunnel syndrome. (Tr. 245-247).
On July 19, 1993, Plaintiff was examined by Dr. Cox for an evaluation for social security disability. Plaintiff complained to the doctor of occasional aching and nagging backache as well as some numbness down her left leg. Plaintiff told the doctor that walking tended to decrease her pain, but sitting tended to increase it. She said she could stand for thirty minutes whereas sitting tended to bother her and cause some numbness in her left leg. (Tr. 235). Physical examination revealed Plaintiff's blood pressure to be 125/85. Plaintiff was able to walk on her toes and heels bilaterally. She had decreased sensation at L5-S1 on the left side. Straight leg raising was negative on the right at 90 degrees, but 80 degrees on the left caused back pain. She had mild paraspinal muscle spasms. Plaintiff had some limited range of motion of the thoracolumbar spine with some back discomfort. She was able to stoop. (Tr. 235).
Dr. Cox reported that Plaintiff could frequently lift and/or carry twenty-five pounds, she could stand and/or walk a total of four hours in an eight-hour day and could continuously stand or walk for one hour. She could sit for a total of three hours in an eight hour day and could continuously sit for fifteen minutes. Her ability to push and/or pull was limited because of her back pain. He believed she could occasionally balance, stoop, kneel, crouch and bend. (Tr. 236-237). Dr. Cox believed that rest would be helpful for Plaintiff, specifically, assuming a reclining position for up to thirty minutes one to three times a day, assuming a supine position for up to thirty minutes one to three times a day and elevating her legs one to three times a day while sitting. (Tr. 238).
On October 24, 1994, Dr. Cox examined Plaintiff at the request of the Maries County Family Services. Her complaints included low back pain primarily on the left side and tingling and numbness down the left lower extremity involving essentially all the toes. She also complained of weakness, numbness and aching of both hands, worse on the left side. Physical examination revealed that Plaintiff was able to walk on her heels and toes, although both tended to cause pain in her low back. She had positive straight leg raising on the right at 70 degrees and at 40 degrees on the left. The doctor noted that a positive MRI in 1992 suggested Plaintiff to have problems in her back on the right. However, her symptoms on October 24, 1994, were primarily on the left, which the doctor found to be inconsistent. The doctor believed that Plaintiff's disc herniation which was in evidence in the 1992 MRI was probably therefore no longer significant. He reached this conclusion based on the fact that ruptured discs naturally tend to improve on their own in 70 to 90 percent of cases. (Tr. 352). Tinel's and Phalen's signs at the wrists were negative bilaterally. When Plaintiff told the doctor, however, that her hands wake her up from sleep and she tends to drop things from her hands, the doctor believed this suggested carpal tunnel syndrome bilaterally. The doctor believed that, in order to better evaluate Plaintiff, a repeat bilateral nerve conduction velocity study should be obtained to check for any peripheral entrapment neuropathy or any residual carpal tunnel syndrome. He also believed it would be appropriate to do a myelogram and post myelogram CT on the low back. (Tr. 351).
On October 25, 1994, Plaintiff was examined by A.M. Hooshmand, M.D., a neurologist, for complaints of pain and numbness of both hands. Examination revealed that Plaintiff's motor power was normal and symmetrical in both arms and both legs. Deep tendon reflexes were 1 + in both arms and both legs. Tinel's sign was positive bilaterally. No Phalen's sign was elicited. Coordination and all sensory modalities were completely within normal limits. Plaintiff had nerve conduction velocity studies of both motor medial nerves and both motor ulnar nerves. She also had an EMG conducted. The doctor believed that the results of the tests were compatible with left carpal tunnel *1050 syndrome and evidence of borderline to early stage of right carpal tunnel syndrome. (Tr. 355-356).
Plaintiff underwent a lumbar myelogram on October 28, 1994. (Tr. 342-347). Dr. Cox noted that same date that the lumbar myelogram and post myelogram CAT scan were positive for a protruding disc centrally and leftwards at the level of L5-S1. He believed this to be consistent with her symptoms. The doctor believed that Plaintiff would get better with the passage of time. The doctor also noted that Plaintiff's nerve conduction velocity study showed an increased distal latency on the left side and slightly increased distal latency on the right median nerve. It was possible that the entire nerve was not thoroughly decompressed with Plaintiff's prior left carpal tunnel release and Plaintiff might have to have another surgery. The doctor believed Plaintiff's carpal tunnel problem and low back problem were both potentially correctable problems if her pain became significantly bothersome to the point where it was preventing her from working. (Tr. 350).
On April 28, 1995, Dr. Cox evaluated Plaintiff for Family Services. He had not seen Plaintiff since October 1994. Plaintiff presented with symptoms primarily in the right low back and she continued to have the numbness and tingling in both hands. Physical examination revealed a negative Tinel's sign and a negative Phalen's sign bilaterally showing no objective evidence of carpal tunnel syndrome. However, based on her EMG/NCV studies of October 25, 1994, the doctor found her to have left carpal tunnel syndrome and borderline to early stage right carpal tunnel syndrome. She was able to walk on her heels and toes. Her ankle and knee jerks were normal. Reflexes in the upper extremities were also normal. Straight leg raising with Plaintiff lying on her back at caused some discomfort in her back both on the left and the right at ninety degrees. Using a dynamometer to check the grip strength of the hands, the doctor noted some inconsistency of the right hand. The first time Plaintiff did it, it registered thirty pounds and the second time it registered only ten pounds, which indicated to the doctor that perhaps Plaintiff was not fully cooperating. On the left side it was ten pounds on both occasions. With range of motion of the thoracolumbar spine, Plaintiff was able to flex but at all times complained of pain in the low back. (Tr. 349). The doctor noted that Plaintiff had no radiculopathy of the lumbar region which was an improvement compared to when he saw her in October 1994. She had symptoms consistent with bilateral carpal tunnel syndrome but no signs. The doctor opined as follows:
Because I find no significant objective evidence of neurologic impairment, I think it will be appropriate to have this patient evaluated by a physiatrist for the determination of incapacity. At this time, I will have to say that I do not find her objectively to have any significant incapacity for gainful employment. However, I would say that perhaps she should be given 2 months during which time a physiatrist should be able to evaluate her and conclude whether there any [sic] incapacity is present.
(Tr. 349).
On July 10, 1996, Dr. Cox wrote a letter to Plaintiff's attorney in which he stated:
I have reviewed my various notes as well as the Medical Source Statement that I prepared on 7/19/93. The last time I saw Mrs. Monier was on 4/28/95 while I was employed at the Jefferson City Bone & Joint Clinic. I saw her then for an evaluation of her back for Family Services. When I compare my notes of that evaluation of 4/28/95 and the Medical Source Statement that I prepared on 7/19/93, I could see no significant change in that the patient has not improved to any significant degree clinically over that period of time. I really don't know how she's doing now since it has been over one year since I have last seen her. I have no reason to believe that she should be better. She did call my office on 5/2/96 for some anti-inflammatory medications which I prescribed for her. They were Motrin, 600 mgs, 50 tablets, one t.i.d.
(Tr. 357).
On August 9, 1996, Plaintiff was examined by Dr. Cox, who was now with Neurosurgery-Spine *1051 Specialists, Inc. He stated that the last time he saw her prior to this was on April 28, 1995. He evaluated her on August 9th because Plaintiff had been requesting medications and the doctor thought it appropriate to re-evaluate her. Plaintiff complained to him of generalized aches and pains, and generalized tiredness and fatigue, primarily stiffness, achiness, and numbness in the low back and down both lower extremities, but worse on the left side. Dr. Cox was not able to elicit Tinel's or Phalen's with either wrist so, clinically, he acknowledged that he did not have any evidence of carpal tunnel syndrome. However, based on Plaintiff's EMG and nerve conduction velocity studies and Plaintiff's clinical symptoms, the doctor nonetheless found Plaintiff to have bilateral carpal tunnel syndrome. Plaintiff told the doctor that her symptoms in the back and legs were aggravated by bending, by sitting for longer than 10-15 minutes and by prolonged standing in one place. Also, vacuuming increased her low back pain. Plaintiff said she gets relief by walking and taking Ibuprofen, having hot baths and using a heating pad. (Tr. 359). Physical examination revealed that Plaintiff was able to walk on her heels and toes. Her reflexes were normal. Straight leg testing was negative on the right at 90 degrees and on the left it was positive at 60 degrees causing pain in the low back, both on the left and on the right. (Tr. 359). The doctor noted that on previous evaluations, there was evidence of protruding disc, leftward and centrally at L5-S1, and a bulging disc at 3-4 and 4-5 in the lumbar region. The doctor's impression was; (1) chronic low back and bilateral lower extremity pain from lumbar spondylosis; (2) chronic bilateral upper extremity discomfort, numbness and weakness from bilateral carpal tunnel syndrome; and (3) post-left carpal tunnel syndrome release. (Tr. 358). The doctor concluded that Plaintiff does have some chronic discomforts. She continues to be moderately obese and her walking and general exercises tend to keep her flexible and keep the pain tolerable. She is not at the point where she would require surgical intervention at this time. (Tr. 358).

V.

DETERMINATION OF THE ALJ
After considering the evidence of record, the ALJ concluded that Plaintiff was not under a "disability," as that term is defined in the Social Security Act, at any time through the date of the decision. (Tr. 282). She found that Plaintiff met the disability insured status requirements as of March 2, 1990, and noted that Plaintiff has not engaged in substantial gainful activity since at least March 2, 1990. (Tr. 282).
The ALJ assessed the medical records and set forth Plaintiff's medical history. She determined that the medical evidence established that Plaintiff had a herniated disc at L5-S1, bulging discs at L3-4 and L4-5, lumbar spondylosis, and bilateral carpal tunnel syndrome. However, she did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 281).
The ALJ next determined whether Plaintiff could perform her past relevant work and, if not, whether there was other work she could perform. In making this determination, the ALJ assessed Plaintiff's residual functional capacity. The medical evidence and Plaintiff's subjective complaints were considered in determining her residual functional capacity.
The ALJ found that Plaintiff's testimony, insofar as it related to disabling and debilitating subjective complaints, was not credible and therefore not entitled to significant weight and consideration. Considering Plaintiff's allegations pursuant to Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), the ALJ listed the following factors which detracted from Plaintiff's credibility; (1) the objective medical evidence did not support Plaintiff's complaints; (2) there were numerous inconsistencies portrayed by Plaintiff during the functional assessment in December 1992; (3) Plaintiff sought limited medical attention after receiving her medical source statement from Dr. Cox in July 1993; (4) Plaintiff's pain appeared to be controlled with medication; (5) Plaintiff has not required surgery or prolonged hospitalization *1052 since the date of her left carpal tunnel release; nor has she required the prolonged use of an assistive device such as a cane or brace for the purpose of ambulation or motion due to back pain; (6) Plaintiff's daily activities were not indicative of a disabling impairment; (7) Plaintiff was able to complete a forty-week program at a metropolitan business college, attaining a certification as an Administrative Medical Assistant; (8) Plaintiff has looked for work since her alleged onset date which suggests that she believes she can work; (9) Plaintiff failed to comply with prescribed remedial treatment without good cause; (10) despite allegations of disabling physical pain, there is no presence of persistent and progressive atrophy; (11) Plaintiff's lack of use of strong pain medication is inconsistent with one suffering from disabling pain; and (12) Plaintiff appears to be motivated to qualify for benefits. For all of these reasons, the ALJ concluded that Plaintiff was not a credible witness and was exaggerating her complaints in an attempt to qualify for benefits.
The ALJ found that the evidence establishes that Plaintiff's impairments preclude, at most, repetitive bending, lifting more than ten pounds on the right, lifting more than five pounds on the left, lifting more than fifteen pounds with both hands, performing work activity requiring vigorous repetitive use of the upper extremities, and performing work activity that does not allow for the ability to alternate between sitting and standing, with half of the work time devoted to each postural position. The ALJ found that the medical evidence did not establish the existence of any other persistent, significant and adverse limitation of function due to any other ailment, Plaintiff could perform prolonged walking. Ordinary movement at the work site, as well as breaks and a meal period, provide Plaintiff with further opportunity to change positions. (Tr. 280).
Judge Weber found that Plaintiff was a "younger individual," had more than a high school education, and did not have transferable work skills outside of the sewing industry. The ALJ found that Plaintiff could not perform her past relevant work. Thus, the ALJ shifted the burden to the Commissioner to show that there were other jobs existing in significant numbers in the national economy which Plaintiff could perform consistent with Plaintiff's medically determinable impairments, functional limitations, age, education and work experience. To meet this burden, the ALJ relied on the evidence of a vocational expert. The ALJ asked the expert whether a hypothetical individual of Plaintiff's age, education and prior work history, with the functional restrictions set forth above, could perform a significant number of jobs in the local and state economies. The expert responded that such an individual could perform work as a receptionist and information clerk. These jobs require use of the hands but not to the extent precluded by Plaintiff's ailments. Plaintiff may need to use a pen or make change in such positions, but would not utilize her hands in a fashion similar to the manner in which she had used them within the sewing industry. These jobs were noted to exist in the numbers of 720 in Plaintiff's local area, and 12,000 in Plaintiff's state. Thus, the ALJ concluded that there were a significant number of jobs in Plaintiff's local and state economies that Plaintiff could perform.
The ALJ therefore concluded that Plaintiff was not disabled. Plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act. In addition, Plaintiff was not eligible for supplemental security income under section 1614(a)(3)(A) of the Social Security Act. (Tr. 281-282).

VII.

LEGAL STANDARDS
Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. งง 416.920, 404.1529. First, the claimant cannot be engaged in "substantial gainful activity." 20 C.F.R. งง 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. งง 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical *1053 or mental ability to do basic work activities ...." Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. งง 416.920(d), 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, then the claimant is per se disabled. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. งง 416.920(e), 404 .1520(e). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the impairment must prevent claimant from doing any other work. 20 C.F.R. งง 416.920(f), 416.1520(f). If claimant meets these standards, the ALJ will find the claimant to be disabled.
The ALJ's decision is conclusive upon this Court if it is supported by "substantial evidence." Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992); Cline v. Sullivan, 939 F.2d 560, 564 (8th Cir.1991). "Substantial evidence is that which a reasonable mind might accept as adequate to support the Secretary's conclusion." Onstead, 962 F.2d at 804 (quoting Whitehouse v. Sullivan, 949 F.2d 1005, 1007 (8th Cir.1991)). The role of the Court on review of the ALJ's decision is to determine whether substantial evidence supports the ALJ's findings, not to try the issues de novo. Williams v. Bowen, 790 F.2d 713, 715 (8th Cir.1986). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987).
Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir.1984). In Bland v. Bowen, 861 F.2d 533 (8th Cir.1988), the Eighth Circuit Court of Appeals held:
[t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.
Id. at 535, See also Metcalf v. Heckler, 800 F.2d 793, 794 (8th Cir.1986); Clark v. Heckler, 733 F.2d at 68. Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion. Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir.1991); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir.1989).
To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:
(1) The findings of credibility made by the ALJ;
(2) The education, background, work history, and age of the claimant;
(3) The medical evidence given by the claimant's treating physicians;
(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
(5) The corroboration by third parties of the claimant's physical impairment;
(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
(7) The testimony of consulting physicians.
Brand v. Secretary of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir.1980); Cruse v. Bowen, 867 F.2d at 1185.
The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. ง 416(I)(1)(A); 42 U.S.C. ง 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment. Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir.1993); Roach v. Sullivan, 758 F.Supp. 1301, 1306 (E.D.Mo.1991).
"While the claimant has the burden of proving that the disability results from a *1054 medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). When evaluating evidence of pain, the ALJ must consider:
(1) the claimant's daily activities;
(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
(3) any precipitating or aggravating factors;
(4) the dosage, effectiveness and side effects of any medication; and
(5) the claimant's functional restrictions.
Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir.1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors as well as the plaintiff's appearance and demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse v. Bowen, 867 F.2d 1183 (8th Cir.1989).
The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir.1992); Ricketts v. Secretary of Health & Human Services, 902 F.2d 661, 664 (8th Cir.1990); Jeffery v. Secretary of Health & Human Services, 849 F.2d 1129, 1132 (8th Cir.1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Id.; Butler v. Secretary of Health & Human Services, 850 F.2d 425, 426 (8th Cir.1988). Although credibility determinations are in the first instance for the ALJ and not the court, the ALJ's credibility assessment must be based upon substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir.1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir.1985).
When, as here, a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987).
Where the ALJ holds that the plaintiff cannot return to his past relevant work, the burden shifts to the Commissioner to show other work that the plaintiff could perform in the national economy. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir.1983). This is a two-part burden. First, the Commissioner must prove that the plaintiff has the residual functional capacity to perform other kinds of work. Residual functional capacity is defined as what claimant can do despite his limitations (20 C.F.R. ง 404.1545(a)(1983)), and includes an assessment of physical abilities and mental and other impairments. (20 C.F.R. ง 404.1545(b), (c), (d)(1983)). The Commissioner has to prove this by substantial evidence. Warner, 722 F.2d at 431. Second, once the plaintiff's capabilities are established, the Commissioner has the burden to demonstrate that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Id.
To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 176; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir.1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir.1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir.1989).

*1055 VI.

DISCUSSION
The issue before the Court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992). Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.1992). Thus, even if there is substantial evidence which would support a decision opposite to that of the Commissioner, the Court must affirm his decision as long as there is substantial evidence in favor of his position. Jones, 86 F.3d at 826.
Plaintiff states that substantial evidence does not support the ALJ's determination. Specifically, Plaintiff claims that the ALJ's residual functional capacity finding is not supported by substantial evidence on the record as a whole and should, therefore, be reversed. Defendant disagrees. The Court finds that substantial evidence on the record as a whole supports the Commissioner's determination. Therefore, the determination will be affirmed.

A. OBJECTIVE MEDICAL EVIDENCE
The ALJ's decision is supported by the objective medical evidence. While there is no doubt that Plaintiff suffers from some physical limitations as a result of her back problems, carpal tunnel symptoms, venous insufficiency and hypertension, there is no objective medical evidence suggesting that Plaintiff's impairments or a combination of the impairments are significant enough to cause disability precluding the performance of any substantial gainful activity.

1. Venous Insufficiency
First, the objective medical evidence does not support a finding that Plaintiff suffers from disabling venous damage of the upper and lower extremities. A venous duplex scan with arterial screening performed in July 1992 revealed "probable" venous insufficiency of the lower left extremity, no evidence of venous thrombosis and a normal bilateral lower extremity Doppler arterial screening examination. Although Plaintiff complained to Dr. Demorlis in November 1992 of lower extremity vein damage, Dr. Demorlis found no evidence of joint swelling, varicosities or atrophy. There is no other medical evidence concerning Plaintiff's claims of disabling venous damage. As such, the objective medical evidence supports the ALJ's conclusion that Plaintiff can perform substantial gainful activity as identified by the vocational expert.

2. Hypertension
Second, the objective medical evidence does not support a finding that Plaintiff suffers from disabling hypertension. Dr. Reed first noted elevated blood pressure on May 17, 1991, with a blood pressure reading of 148/100. Blood pressure readings in June and July 1991 were 168/100, 158/100 and 142/98. Plaintiff was started on anti-hypertensive medication. Thereafter, her blood pressure readings in August 1991 were 124/84 and 120/82. The doctor noted at that time that Plaintiff's hypertension was much improved. The doctor instructed Plaintiff to continue taking her medication. Despite the doctor's directive, Plaintiff stopped taking her medication. Plaintiff's blood pressure was 144/96 in November 1991. Dr. Reed again commented that Plaintiff's hypertension was well controlled with medication and instructed Plaintiff to begin taking the medication.
The record clearly establishes that Plaintiff's blood pressure readings have been within the normal range and only a few reached the mild to moderate stage. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir.1992) (high blood pressure reading of 170/90 indicates only moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir.1985) (blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate; moreover, claimant's hypertension does not qualify as a severe impairment under the Commissioner's regulations, because *1056 it did not result in damage to the heart, eye, brain or kidney).
In addition, Dr. Reed repeatedly stated that Plaintiff's hypertension was well-controlled with medication. Impairments which are remediable by treatment, medication or surgery are not disabling. Harris v. Heckler, 756 F.2d 431, 435-36 n. 2 (6th Cir. 1985). See also Murphy, 953 F.2d at 384; Warford v. Bowen, 875 F.2d 671, 673 (8th Cir.1989) (a medical condition that can be controlled by treatment is not disabling); James by James v. Bowen, 870 F.2d 448, 450 (8th Cir.1989).
In sum, there is no objective medication evidence suggesting that Plaintiff suffers from disabling hypertension. Instead, the records support the determination of the ALJ that Plaintiff is capable of engaging in substantial gainful activity.

3. Back Problems
Third, the objective medical evidence does not support a finding that Plaintiff suffers from a disabling back condition. In February 1990, although Plaintiff complained of pain in the neck and low back, she had full range of motion in the cervical spine, she had full forward flexion in the lumbar spine, straight leg raising was negative and there was no evidence of limitation of spine movement or evidence of muscle spasm. X-rays of the cervical spine did not show specific evidence of degenerative intervertebral disc change nor of significant arthritic change. Lumbar spine x-rays were unremarkable except for marginal early arthritic spurring.
Plaintiff did not complain of back pain again until after she was involved in a car accident at the end of October 1990. In January 1991, however, Plaintiff reported to Dr. Leslie that she was feeling better. Straight leg raising was negative. Plaintiff was instructed to perform back exercises. In February 1991, Plaintiff reported to Dr. Leslie that she was better and that the exercises were helping. In March 1991, she reported again that she felt better and reported backache only in bad weather. Plaintiff reported to Dr. Leslie in May 1991 that her back felt better. Physical examination at that time revealed that Plaintiff had a full range of motion in her back and straight leg raising was negative bilaterally. In July 1991, Plaintiff had good range of motion in her back and straight leg raising was negative bilaterally. In October 1991, Plaintiff reported that, although she still had pain, it was not constant and mostly occurred when she was riding in her truck or had been sitting for a long period of time. She said the pain was not unbearable. Straight leg raising was negative.
In February 1992, Plaintiff began seeing Dr. Cox. Plaintiff underwent an MRI which was positive for a herniated disc on the right side and was negative on the left side. Plaintiff had moderate paraspinal muscle spasm. Plaintiff received an epidural injection followed by a program of physical therapy. In March 1992, Plaintiff informed Dr. Cox that she had improved following her epidural injection and she also stated that therapy was working. By April 1992, Plaintiff's low back pain had continued to improve. Plaintiff reported that she was walking five miles a day. In August 1992, Plaintiff was seen by Dr. Cox for a final evaluation. The doctor noted that, although Plaintiff had some structural abnormalities in her low back, i.e., the herniated disc at L5-1, slightly symmetric bulging at L4-5 and disc desiccation, she was doing very well and was largely asymptomatic. Dr. Cox discharged Plaintiff from his care.
When Plaintiff was evaluated by Dr. Demorlis in November 1992 for a disability physical, she could squat and heel/toe walk. She had a normal gait and had full range of motion in her spine. When Plaintiff underwent a comprehensive functional capacity evaluation in December 1992, it was noted that Plaintiff had an independent gait requiring no assistive device, she could heel/toe walk, she could squat, and she was able to forward flex.
On July 19, 1993, almost a year after Plaintiff last saw Dr. Cox, Dr. Cox found that Plaintiff was able to heel and toe walk. Straight leg raising was negative on the right to 90 degrees and 80 degrees on the left. She had mild paraspinal muscle spasms and some limited range of motion of the thoracolumbar spine. She was able to stoop. In a *1057 Medical Source Statement completed that same day, Dr. Cox indicated that Plaintiff could occasionally lift up to ten pounds, stand or walk for four hours in an eight hour work day and for only one hour continuously, and sit for three hours in an eight hour work day and only for thirty minutes continuously. Dr. Cox determined that Plaintiff would be benefitted by reclining, laying supine, or propping up her legs, one to three times daily.
Dr. Cox did not see Plaintiff again until fifteen months later, when Dr. Cox examined Plaintiff on October 24, 1994, at the request of the Maries County Family Services. Although she complained of low back pain, Plaintiff was able to heel/toe walk. The doctor believed that the herniated disc in evidence on Plaintiff's 1992 MRI had probably resolved itself. Although a lumbar myelogram was positive for a protruding disc, the doctor believed that this would get better with the passage of time. Moreover, the doctor opined that if Plaintiff's pain became significantly bothersome to the point where it was preventing her from working, her problem was correctable with surgery.
On April 28 1995, Dr. Cox evaluated Plaintiff and noted that she was able to heel/toe walk, straight leg raising was negative to 90 degrees with only some discomfort, Plaintiff had full range of motion of the spine. The doctor opined that "[a]t this time, I will have to say that I do not find her objectively to have any significant incapacity for gainful employment." (Tr. 349). On August 9, 1996, Dr. Cox noted that Plaintiff was able to heel/toe walk, straight leg testing was negative on the right at 90 degrees and on the left to 60 degrees. Dr. Cox diagnosed Plaintiff with lumbar spondylosis. He did not believe surgery was warranted.
Clearly, there is no objective evidence to suggest that Plaintiff is incapable of performing substantial gainful activity. Plaintiff claims there is evidence to support Plaintiff's disability, relying primarily on Dr. Cox's Medical Source Statement of July 1993, in which Dr. Cox reported that Plaintiff could only sit and stand a total of seven hours a day and should rest one to three times a day. The Court finds, however, that the ALJ properly rejected this opinion of Dr. Cox.
While it is true that the opinions and findings of a claimant's treating physician are entitled to considerable weight, this is true only if the opinions and findings are based on sufficient medical data and laboratory diagnostic techniques and are not controverted by substantial medical or other evidence. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989) (these opinions are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); Veal v. Bowen, 833 F.2d 693, 699 (7th Cir.1987); Turpin v. Bowen, 813 F.2d 165, 170-171 (8th Cir.1987); Landsaw v. Secretary of Health & Human Services, 803 F.2d 211, 213 (6th Cir.1986); King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984); Houston v. Secretary of Health & Human Services, 736 F.2d 365, 367 (6th Cir. 1984).
The ALJ discounted Dr. Cox's Medical Source Statement first because it was not supported by the doctor's own objective findings made that same day. Plaintiff could heel and toe walk. There was only mild paraspinal muscle spasms present. There was full straight leg raising on the right and near straight leg raising on the left. Plaintiff could stoop and lumbar flex to seventy degrees with only some discomfort. Plaintiff admitted to walking four to five miles a day. Instead of being based on his own medical findings, Dr. Cox's report appeared to be based on Plaintiff's subjective opinion as to how long she felt that she could comfortably perform such activities. In light of the fact that the limitations indicated by Dr. Cox did not reflect his own medical findings, the ALJ properly gave little weight to the doctor's July 19, 1993 medical source statement.
Dr. Cox's Medical Source Statement is also contradicted by his own subsequent medical records. When Dr. Cox saw Plaintiff for the first time fifteen months after he issued his Medical Source Statement, he believed that Plaintiff's disc problem which was in evidence in the 1992 MRI had resolved. Although a lumbar myelogram in October 1994 was positive for protruding disc, Dr. Cox believed that this would get better with *1058 the passage of time. In April 1995, Plaintiff was able to heel and toe walk, straight leg raising was negative to 90 degrees, Plaintiff had full range of motion of the spine and she had no radiculopathy of the lumbar region which he noted to be an improvement over her October 1994 visit. Dr. Cox opined that "[a]t this time, I will have to say that I do not find her objectively to have any significant incapacity for gainful employment." (Tr. 349). In August 1996, Dr. Cox did not believe that Plaintiff's back condition required surgical intervention. Clearly, nothing in Dr. Cox's medical records support his conclusion in his July 1993 Medical Source Statement that Plaintiff was limited in sitting and standing to seven hours a day and should rest and elevate her legs several times a day.
Finally, Dr. Cox's Medical Source Statement is contradicted by all of the other medical evidence concerning Plaintiff's back. This contradictory evidence has been set forth in detail above.
For all of these reasons, the Court finds that the ALJ did not err in giving little weight to the limitations identified by Dr. Cox in his July 1993 Medical Source Statement. Dr. Cox's opinions and findings were not based on sufficient medical data and laboratory diagnostic techniques. Moreover, they were controverted by substantial medical or other evidence. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989); Veal v. Bowen, 833 F.2d 693, 699 (7th Cir.1987); Turpin v. Bowen, 813 F.2d 165, 170-171 (8th Cir.1987); Landsaw v. Secretary of Health & Human Services, 803 F.2d 211, 213 (6th Cir. 1986); King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984); Houston v. Secretary of Health & Human Services, 736 F.2d 365, 367 (6th Cir.1984).
In sum, the objective medical evidence does not support Plaintiff's position that she suffers from a disabling back condition. Instead, the objective medical evidence supports the ALJ's conclusion that Plaintiff can engage in substantial gainful activity.

4. Carpal Tunnel Syndrome
Finally, the objective medical evidence does not support a finding that Plaintiff suffers from disabling carpal tunnel syndrome to the extent that she can engage in no substantial gainful activity. In February 1990, Dr. Leslie noted that Plaintiff was able to make a full fist. She did have bilateral glove type decrease in sensation from the wrist down. X-rays of the hands showed some very mild early arthritic changes but otherwise were normal. Dr. Leslie stated that the possibility of impending carpal tunnel syndrome should be considered.
Nerve conduction studies in March 1990 were consistent with bilateral carpal tunnel syndrome. In May 1990, Dr. Reed diagnosed Plaintiff with bilateral carpal tunnel syndrome and tenosynovitis of the right thumb. She indicated that Plaintiff should avoid repetitive activities, gripping and pulling with the hands. Carpal tunnel release surgery was performed by Dr. Leslie on Plaintiff's left hand on July 26, 1990.
After Plaintiff's surgery, Dr. Leslie reported in December 1990 that Plaintiff had progressed well following the surgery with the return of strength to a satisfactory level in the left hand. Although the doctor noted some mild symptoms in the right hand, he did not feel that surgery was indicated. The doctor believed that Plaintiff could return to work, but found her to be disabled as far as physical repetitious work activities were concerned.
Although Dr. Leslie found Plaintiff to be fine in December 1990, in January 1991, Plaintiff complained to Dr. Levy of weakness in her hands with intermittent numbness and occasional tingling. The doctor found Plaintiff's strength to be equal in both hands with no measurable muscle atrophy or motor weakness. There was some diminished sensation to pin prick in a stocking distribution of the left hand, however there was no relation to a dermatome pattern. Tinel's sign was negative. There was only slight discomfort on motion of both wrists, deep tendon reflexes were equal and active bilaterally, circulation was normal and Plaintiff had a full range of motion in all joints.
Plaintiff received no further medical attention for her wrists until December 1991 when she complained to Dr. Reed of wrist pain. *1059 The doctor diagnosed her with tenosynovitis of the right hand, instructed her to splint the wrist and to take Naprosyn.
Almost a year later, Plaintiff was examined by Dr. Demorlis for the Office of Disability Determinations. He noted that she had stocking glove decreased sensation of the left forearm, wrist, hand and fingers. Tinel's sign was negative. She had complete range of motion in her wrists and she could fully extend her hands and make fists. The doctor found that she had subjective hypoparesthesia of the left forearm and wrist and hyperparesthesia of the right wrist and hand, apparently due to carpal tunnel.
When Plaintiff underwent a Comprehensive Functional Capacity Evaluation in December 1992, the doctor noted that there appeared to be discrepancies between Plaintiff's perception of her functional abilities, her results of the musculoskeletal and hand evaluations and self-reports of specific activities.
In July 1993, Dr. Leslie reported on his Physical Medical Source Statement that Plaintiff was limited in her ability to reach, handle, finger and feel due to her past history of bilateral carpal tunnel syndrome. He believed resuming work of a rapid hand use could cause reactivation of her carpal tunnel syndrome. Test results from an EMG and nerve conduction study in October 1994 were compatible with left carpal tunnel syndrome and evidence of borderline to early stage of right carpal tunnel syndrome.
Physical examination by Dr. Cox in April 1995 revealed a negative Tinel's sign and a negative Phalen's sign bilaterally showing no objective evidence of carpal tunnel syndrome. Using a dynamometer to check Plaintiff's grip strength, the doctor noted some inconsistency of the right hand suggesting that perhaps Plaintiff was not fully cooperating. The doctor found that Plaintiff had symptoms consistent with bilateral carpal tunnel syndrome but no signs. He opined that he did not find Plaintiff objectively to have any significant incapacity for gainful employment. Again in August 1996, Dr. Cox reported that he was unable to elicit Tinel's or Phalen's with either wrist and acknowledged that he did not have any evidence of carpal tunnel syndrome.
The objective medical evidence suggests that although Plaintiff had carpal tunnel syndrome in the left hand, she had surgery for this which improved her condition. Plaintiff's right hand is borderline to early stages of carpal tunnel syndrome and does not require surgical intervention. Despite EMG and nerve conduction studies showing carpal tunnel syndrome in October 1994, Dr. Cox was repeatedly unable to elicit any objective findings to support carpal tunnel syndrome from October 1994 through August 1996. Most doctors agreed that Plaintiff need only avoid work requiring repetitive hand movement. All of this evidence supports the ALJ conclusion that Plaintiff could engage in substantial gainful activity which did not require vigorous repetitive use of the upper extremities. Moreover, the jobs identified by the vocational expert, which the ALJ found Plaintiff to be capable of performing, clearly do not require the repetitive use of the upper extremities as restricted by the doctors.

5. Summary
Clearly, the objective medical evidence does not support a finding that Plaintiff's impairments are so disabling to the extent that she can perform no work at all. Instead, the objective medical evidence supports the ALJ's determination that Plaintiff has the residual functional capacity to engage in substantial gainful activity, so long as she is not required to lift more than ten pounds on her right, to lift more than five pounds on the left, to lift more than fifteen pounds with both hands, to perform work activity requiring vigorous repetitive use of the upper extremities, and to perform work activity that did not allow for a sit/stand option.

B. SUBJECTIVE COMPLAINTS
The ALJ found that Plaintiff's complaints of pain were not entirely credible. The issue is not whether Plaintiff experiences pain, but whether her subjective complaints are credible to the extent that they are disabling. Pickner v. Sullivan, 985 F.2d 401, 404 (8th Cir.1993).
*1060 In determining that Plaintiff's subjective complaints were not credible, the ALJ properly considered Plaintiff's subjective complaints of a disabling impairment pursuant to the guidelines set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984). The ALJ expressly discredited Plaintiff's testimony and gave good reasons for doing so. Judge Weber identified the following factors, all of which are supported by the record, which detract from the credibility of Plaintiff's subjective complaints of a disabling impairment.
First, the ALJ found that the objective medical evidence on the record as a whole did not support a finding of disability. A lack of objective medical evidence detracts from Plaintiff's subjective complaints. While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir.1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir.1987).
Second, there were numerous inconsistencies portrayed by Plaintiff during her functional capacity assessment in December 1992. The evaluating physician noted several inconsistencies with regard to Plaintiff's complaints and abilities. For example, pain rating of the back provided by Plaintiff was noted not to correlate with the observed movement patterns during repetitive and fast repetitive lumbar bending. Another example includes Plaintiff stating she could not complete a task requiring her to push an empty sled requiring eighteen foot pounds of force. However, she was observed to "easily" push open the clinic door at the time of departure, demonstrating the ability to utilize thirty-two foot pounds of force. The Court also notes that, on another occasion, Dr. Cox reported in April 1995, that when he tested Plaintiff on the dynamometer, he noticed some inconsistency with the right hand, which indicated to him that perhaps Plaintiff was not fully cooperating. If inconsistencies exist in the record, the ALJ may disbelieve the claimant's subjective testimony of disabling impairments. Aborn v. Sullivan, 959 F.2d 111, 112 (8th Cir.1992); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir.1991); Dawson v. Bowen, 815 F.2d 1222, 1226 (8th Cir.1987).
Third, Plaintiff sought limited medical attention after receiving her Medical Source Statement from Dr. Cox in July 1993. Specifically, Plaintiff did not seek medical care or an examination from Dr. Cox for complaints of back pain from July 1993 through October 1994 or April 1995 through August 1996. This is inconsistent with claims of a disabling impairment. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir.1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir.1989); Johnson v. Bowen, 866 F.2d 274 (8th Cir.1989).
Fourth, Plaintiff's pain appeared to be controlled with medication with the use of Ibuprofen and Motrin, as prescribed by Dr. Cox. Conditions which can be controlled by medication or treatment are not disabling. Harris v. Heckler, 756 F.2d 431, 435-36 n. 2 (6th Cir.1985). See also Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir.1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir.1989)(a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir.1989).
Fifth, Plaintiff has not required surgery or prolonged hospitalization since the date of her left carpal tunnel release; nor has she required the prolonged use of an assistive device such as a cane or brace for the purposes of ambulation or motion due to her back pain. The ALJ found this to be significant in detracting from Plaintiff's complaints of disabling pain. The Court, likewise, finds the lack of surgery to be significant in light of the treating physicians' opinions that Plaintiff's conditions could be corrected with surgery should her pain become bothersome enough to preclude her from working.
Sixth, the ALJ considered Plaintiff's daily activities and found that her activities were not those of one in severe chronic discomfort. The ALJ noted that Plaintiff walked two and one-half miles, two times a day. Also, Plaintiff cooked, did housework, attended craft fairs and drove an automobile. While the *1061 undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with Plaintiff's subjective complaints of a disabling impairment. Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987)(a claimant who washes dishes, cooks breakfast and lunch and walks two blocks every morning engages in activities that could be seen as inconsistent with a disability). See also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir.1992); Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir.1987).
Seventh, Plaintiff was able to complete a forty-week program at a metropolitan business college after her alleged disability onset date. The ALJ could properly find this detracted from Plaintiff's assertion that she could not engage in any substantial gainful activity due to her impairments.
Eighth, Plaintiff has looked for work since her alleged onset date which suggests that she believes she can work. See Naber v. Shalala, 22 F.3d 186, 188 (8th Cir.1994) (while an intention to return to work is laudable, it proves that the claimant is able to work and, therefore, is inconsistent with a claim that the claimant cannot engage in any kind of substantial gainful work).
Ninth, Plaintiff failed to comply with prescribed remedial treatment without good cause. The ALJ noted that Plaintiff was non-compliant with daily hand exercises and only performed them when her hands hurt. Moreover, Dr. Reed noted Plaintiff to be non-compliant with her blood pressure medications. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir.1989)(ALJ can discredit subjective complaints of pain based on claimant's failure to follow prescribed course of treatment); Weber v. Harris, 640 F.2d 176, 178 (8th Cir.1981).
Tenth, despite allegations of disabling physical pain, there is no presence of persistent and progressive atrophy. The ALJ found that there was no evidence of atrophy or muscle weakness noted by Dr. Levy in January 1991. There was no evidence of atrophy of the upper extremities noted during Dr. Demorlis' consultative examination in November 1992. Evidence of atrophy was not noted in an examination summary dated August 9, 1996, by Dr. Cox. The ALJ found that the lack of evidence regarding the presence of persistent and progressive muscular atrophy was inconsistent with allegations of disabling physical pain.
Eleventh, the ALJ found that Plaintiff only took Ibuprofen and Motrin for her pain, which she did not take on a daily basis. The ALJ properly concluded that Plaintiff's history of pain medication use is inconsistent with subjective complaints of disabling pain. Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir.1994). See also Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir.1987)(treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse v. Bowen, 867 F.2d 1183, 1187 (8th Cir.1989)(minimal consumption of pain medication reveals lack of disabling pain); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir.1988) (failure to seek aggressive treatment and limited use of prescription medications not suggestive of disabling pain).
Twelfth, the ALJ found that Plaintiff appeared to be motivated to qualify for benefits. The ALJ reached this conclusion based on Plaintiff's testimony that she utilizes rent-free housing, utility assistance, food stamps and general relief income. An ALJ may discount a claimant's subjective complaints for, among other reasons, that she appeared to be motivated to qualify for disability benefits. Dodd v. Sullivan, 963 F.2d 171, 172 (8th Cir.1992).
For the above twelve reasons, the ALJ found Plaintiff's subjective complaints to be not entirely credible. The ALJ did not find that Plaintiff was not impaired at all. Instead, the ALJ found that Plaintiff's impairments were not as severe as she alleged. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir.1991).
The ALJ's credibility findings must be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that *1062 of the ALJ. Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir.1989); Sykes v. Bowen, 854 F.2d 284, 287 (8th Cir.1988). The Court finds the reasons offered by the ALJ in support of her credibility determination to be based on substantial evidence. Therefore, the findings of the ALJ must be affirmed.

C. RESIDUAL FUNCTIONAL CAPACITY
The ALJ concluded that Plaintiff's impairments precluded repetitive bending, lifting more than ten pounds on the right, lifting more than five pounds on the left, lifting more than fifteen pounds with both hands, performing work activity requiring vigorous repetitive use of the upper extremities, and performing work activity that does not allow for the ability to alternate between sitting and standing, with half of the work time devoted to each postural position.
Plaintiff argues that the ALJ erred in concluding that Plaintiff had the residual functional capacity to perform substantial gainful activity which did not include any of the above limitations. More specifically, Plaintiff argues that the ALJ failed to give adequate reasons to discount the findings of Dr. Cox regarding his assessment of Plaintiff's residual functional capacity in his Medical Source Statement of July 1993, and she did not support her own residual functional capacity finding with medical evidence.
As stated earlier in this Court's assessment of the objective medical findings, the Court found that Judge Weber did properly discredit Dr. Cox's Medical Source Statement of July 1993. Moreover, the objective medical evidence clearly supports the ALJ's findings with respect to Plaintiff's residual functional capacity.
Having determined Plaintiff's residual functional capacity, the ALJ asked a hypothetical question to the vocational expert which clearly reflected Plaintiff's residual functional capacity, as supported by the record. The expert testified that, while Plaintiff could not perform her past relevant work, she could perform other jobs, including receptionist and information clerk, and that there were approximately 12,000 such jobs in Missouri. (Tr. 321).
An ALJ posing a hypothetical question to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Sobania v. Secretary of Health & Human Services, 879 F.2d 441, 445 (8th Cir.1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir.1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir.1985). Certainly, testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the ALJ's decision. Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir.1992); Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir.1990). However, where the hypothetical question precisely sets forth all of the plaintiff's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir.1990); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th Cir.1990).
In this case, the hypothetical question presented by the ALJ reflected Plaintiff's testimony at the hearing and included those restrictions found credible by the ALJ. Miller v. Shalala, 8 F.3d 611, 613 (8th Cir.1993). Because the question was properly formulated, the expert's opinion that jobs existed which Plaintiff could perform, constitutes substantial evidence supporting the ALJ's decision. Wingert, 894 F.2d at 298; Trenary, 898 F.2d at 1365.

VII.

CONCLUSION
The Court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole. Thus, the Commissioner's decision should be affirmed.
Accordingly,
*1063 IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment is DENIED. [21]
IT IS FURTHER ORDERED that Defendant's motion for summary judgment is GRANTED.[25]
IT IS FINALLY ORDERED that a separate judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action.
NOTES
[1] President Clinton appointed Kenneth S. Apfel as Commissioner of Social Security, effective September 29, 1997, to succeed John J. Callahan, Ph.D. Therefore, the Court has substituted Kenneth S. Apfel, Commissioner of Social Security, for John J. Callahan, Ph.D., pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.